**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CASE NO. 3:05-CV-612-R**

CASEY WILLIAM HYLAND, et al.                                        PLAINTIFFS

V.

HOMESERVICES OF AMERICA, INC., et al.                              DEFENDANTS

**MEMORANDUM OPINION & ORDER (Sealed)**

  This matter is before the Court upon the parties' motions to exclude the expert testimony

of the opposing parties pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow*

*Pharms. Inc.*, 509 U.S. 579 (1993). Plaintiffs have filed a motion to exclude the expert

testimony of Defendants' expert Gary Kleinrichert, or in the alternative, to exclude Mr.

Kleinrichert's testimony and opinions formed after his deposition was taken (DN 641). The

HomeServices Defendants and Defendant Coldwell Banker McMahan Company have filed

separate motions to exclude the expert testimony of Plaintiffs' experts Dr. Gary French and Dr.

Abdullah Yavas (DN 637 and DN 634). These matters have been fully briefed and are ripe for

adjudication.

**BACKGROUND**

  In this class action, Plaintiffs allege a horizontal price-fixing conspiracy, a *per se*

violation of § 1 of the Sherman Act, 15 U.S.C. § 1.[1] Specifically, Plaintiffs allege that between

2001 and 2005 (the "Class Period") Defendants  combined, conspired, and agreed to fix,

maintain, and inflate real estate broker commissions and associated fees and refused to compete

on the basis of price in real estate transactions within Kentucky. Plaintiffs focus on the alleged

---

[1] A horizontal price-fixing conspiracy, as plaintiffs characterize their allegations, occurs "where
competitors at the same market level agree to fix or control the prices they will charge for their
respective goods or services." *United States v. Brown Univ.*, 5 F.3d 658, 670 (3d Cir.1993).

standard 6% commission rate charged by seller-side real estate brokers for their services, with half of that commission, or a standard 3% commission rate, going to the buyer-side broker. Plaintiffs allege that, in the absence of Defendants' conspiracy, brokers would not charge a 6% full commission rate. Furthermore, Plaintiffs allege that Defendants habitually refused to negotiate a lower commission rate. To the extent Defendants would negotiate, their negotiations were based on the inflated 6% standard, which resulted in buyers paying a higher price than they would have paid in a competitive market, where 6% would not be the starting price for such negotiations.

Plaintiffs have retained two economic experts, Dr. Gary French and Dr. Abdullah Yavas, to opine on the issues of liability and damages. Defendants HomeServices of America, HomeServices of Kentucky, Rector-Hayden Realtors, and Semonin Realtors ("HomeServices Defendants") have filed a motion to exclude the testimony of Dr. French and Dr. Yavas pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993). Defendant Coldwell Banker McMahan Company ("McMahan Company") joined that motion and set forth additional arguments for the exclusion of Mr. French's and Dr. Yavas's testimony specific to McMahan. In addition, Plaintiffs have filed a motion to exclude the testimony of the HomeServices Defendants' expert Gary Kleinrichert.

## STANDARD

Under Federal Rule of Evidence 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness

2

has applied the principles and methods reliably to the facts of the case." Rule 702 was amended in 2000 to address the Supreme Court's seminal opinion of *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny, including *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). *See* Fed. R. Evid. 702, Advisory Committee Notes.

The Sixth Circuit, in *In re Scrap Metal Antirtrust Litigation,* examined Rule 702 and found that a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements: "First, the witness must be qualified by 'knowledge, skill, experience, training, or education.' Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' Third, the testimony must be reliable." 527 F.3d 517, 529 (6th Cir. 2008).

"As a gatekeeper, the trial judge has discretion in determining whether a proposed expert's testimony is admissible based on whether the testimony is both relevant and reliable." *Rose v. Truck Centers, Inc.*, No. 09-3597, 2010 WL 3069613, at *4 (6th Cir. Aug. 6, 2010) (citing *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007); *Daubert*, 509 U.S. at 589). The trial court is guided by rule 702's general standards for assessing reliability: "whether the testimony is based upon 'sufficient facts or data,' whether the testimony is the 'product of reliable principles and methods,' and whether the expert 'has applied the principles and methods reliably to the facts of the case.'" *In re Scrap Metal,* 527 F.3d at 529. The trial judge must assess "whether the reasoning of methodology underlying the testimony is scientifically valid and [ ] whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

The Supreme Court, in *Daubert*, provided a non-exclusive list of factors for trial courts to consider in evaluating reliability. 509 U.S. at 593-594. These factors include: "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation and general acceptance in the scientific community." *In re Scrap Metal Antitrust Litig.*, 527 F.3d, 517, 529 (6th Cir. 2008) (citing *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001)). The test of reliability, however, is a flexible one. *Id.* "A court must be sure not 'to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.'" *Id.* Reliability instead means "an expert's testimony . . . must be 'supported by appropriate validation –i.e., 'good grounds,' based on what is known." *Id.* (citing *Daubert*, 509 U.S. at 590). "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Id.* at 529-30.

An attack on the application of a method "goes to the weight of the evidence, rather than to its admissibility." *Id.* at 530. There are circumstances in which a significant error in application may go to the admissibility, as opposed to the weight of the evidence; however, "'rejection of expert testimony is the exception, rather than the rule . . . and we will generally permit testimony based on allegedly erroneous facts when there is some support for those facts in the record." *Id.* In prior cases the court explained that "although opinions of the proffered testimony 'may very well be 'shaky,'' because the opinions were based upon facts in the record, and were not 'assumptions' or 'guesses,' challenges merely went to the accuracy of the conclusions, not to the reliability of the testimony." *Id.* (citing *Jahn v. Equine Services*, 233 F.3d 382 (6th Cir. 2000)); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000); *U.S. v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993) (stating "weaknesses in the

4

factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on

its admissibility" and "it is up to opposing counsel to inquire into the expert's factual basis.").

      In addition to complying with Rule 702, the admissibility of expert testimony "is also

subject to a determination of relevancy under Rule 401 and balancing of probative value against

likely prejudice under Rule 403." *United States v. Geiger*, 303 F. App'x 327, 329 (6th Cir.

2008).

**ANALYSIS**

**1.  <u>Defendants' Motion to Exclude Expert Testimony of Dr. Gary French</u>**

      Dr. French, who holds a Ph.D. in economics and is a consulting economist with Nathan

Associates Inc., offers opinions as to Defendants' liability and Plaintiffs' damages.  The Court

will separately examine the substance and admissibility of each of these opinions.

    **a.  Dr. French's Testimony on Liability**

        i.  *Dr. French's Report*

      With respect to liability, Dr. French ultimately opines that a price-fixing conspiracy

among real estate brokers in Kentucky likely existed during the Class Period.  French Report,

DN 639-1 at ¶ 104.  As a basis for this ultimate opinion, Dr. French explains how the existence

of specific characteristics of the Kentucky real estate market – such as homogenous services,

transparent pricing practices, high market concentration, similarities among producers, history of

cooperation among producers, and inelastic demand for the services – work to facilitate and

enforce collusion.  Then, utilizing transaction data provided by Defendants ("Defendants' data"),

Dr. French explains how Defendants have engaged in parallel pricing practices.  Dr. French

further analyzes Defendants' data to show how Defendants' commission rates do not comport

with predictions of economic theory.

5

Dr. French calculates the Defendants' average full commission rates and average buyer's broker commission rates by county in Kentucky. DN 639-1 at 197. He finds that the full commission rates during the Class Period were clustered around 6%, which was the exact full commission rate for over 53% of Defendants' transactions. Dr. French also opines that full commission rates between 5% and 7% are consistent with the existence of a conspiracy as the 5% rate often occurs where the same real estate agent serves as the consumer's seller-side broker in selling their home and as the consumer's buyer-side broker on the purchase of a new home. *Id.* at ¶¶ 68-70. Dr. French also finds that Defendants' one-sided commission rates were clustered around 3% during the Class Period, which was the exact buyer's broker commission rate for 77.08% of Defendants' transactions. Dr. French opines that one-sided commission rates between 2% and 4% were consistent with the existence of a conspiracy, as the 2% rate often occurs in the situation described above where the agent offers the consumer a 5% rate to serve as the seller-side broker and buyer-side broker on the purchase of the new home. Dr. French further opines that the greater incidence of the 3% buyer's broker commission rate occurred because buyer's agents must be offered at least 3% or they may not show the listed properties. *Id.* at ¶¶ 71-75.

Further analyzing Defendants' data, Dr. French found that Defendants' commission rates did not vary to any significant extent with housing prices or Defendants' costs, as would be expected absent a pricing conspiracy. During the years 2001 to 2005, Defendants' data shows that the median home price increased from $98,000 in 2002 to $115,000 in 2005; however, Defendants' average commission rate fell from just 5.78% in 2002 to 5.72% in 2005. Dr. French states that the correlation coefficients between the commission rates and the selling prices verifies that there is only a weak correlation between the two variables. According to Dr.

French, economic theory predicts that commission rates would vary inversely with the selling price of the property. Additionally, Dr. French stated that economic theory predicts that, in a competitive brokerage market, commission rates would decrease if brokers' costs declined. However, Semonin Realtor's income statements from 1999-2004 show that its expenses declined as a percent of income yet its average commission rates remained stable between 2001 and 2004. *Id.* at ¶¶ 77-80.

   ii. *Admissibility*

For Dr. French's testimony on liability to be admissible, the Court must determine the following: (1) whether he is qualified, (2) whether his testimony is reliable, and (3) whether his testimony is relevant. *In re Scrap Metal Antitrust Litigation*, 527 F.3d at 529. Defendants do not argue that Dr. French is not qualified to render the testimony at issue. Instead, Defendants contend that Dr. French's testimony regarding the defendants' liability is not reliable, and therefore is not admissible, because it is based on a flawed and incomplete methodology. Defendants contend that, at most, Dr. French's testimony and analysis identifies the possibility of collusion.

In their brief, the HomeServices Defendants present what, in their view, is the generally accepted methodology for determining the existence of collusive activity. According to the HomeServices Defendants, an economist must conduct a three-part methodology before concluding that a price-fixing agreement exists. First, an economist must perform a structural analysis by examining the market to determine if its structure makes collusion plausible by exhibiting features that are conducive to collusion. Second, an economist must perform a behavioral analysis by examining the actual pricing behavior of the alleged members of the conspiracy to determine whether they have adopted parallel pricing decisions and whether those

7

decisions reflect normal responses to changes in economic conditions. Third, an economist must rule out the possibility that the examined pricing decisions are caused by other factors, such as legal collusive behavior. DN 638 at pp. 14-18. Defendants argue that Dr. French did not utilize this generally accepted methodology for determining the existence of a conspiracy, and that is testimony is therefore unreliable.

First, Defendants contend that Dr. French did not perform a reliable structural analysis because he (1) failed to identify the relevant geographic market or analyze the market power therein, and (2) failed to analyze whether the factors he considered might have pro-competitive or public policy explanations, and (3) failed to identify the rules or regulations necessary for a cartel to establish, maintain, and enforce the terms of its coordination. Second, Defendants contend that Dr. French did not conduct a reliable behavioral analysis because he did not scientifically or analytically examine Defendants' actual pricing data and did not attempt any other empirical analysis of any Defendant's pricing in isolation or in combination with any other Defendant. Specifically, Defendants contend that Dr. French (1) did not analyze the spectrum of Defendants' commissions across Kentucky, (2) ignored the real differences among Defendants' charged commissions, and (3) did not consider potential non-collusive causes for the perceived predominance of commissions between 5% and 7%. Third, Defendants contend that Dr. French's testimony is inadmissible because he did not affirmatively rule out the possibility that the examined pricing decisions are caused by other factors, such as legal collusive behavior.

Although Defendants have put forth in their briefing what they consider to be a reliable methodology for determining the existence of a conspiracy, Defendants seem to confuse and conflate the issue of admissibility with the issue of the sufficiency of Plaintiffs' evidence to survive summary judgment. Dr. French's testimony "need not show a successful conspiracy to

be admitted under Rule 702 as circumstantial evidence of a conspiracy." *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 564 (11th Cir. 1998). Additionally, Dr. French's testimony need not prove Plaintiffs' case by itself. *See id.* at 565. Instead, to be admissible, Rule 702 only requires that an expert's testimony *assist* the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702. The Court finds that Dr. French's testimony regarding (1) the characteristics of the real estate market in Kentucky which make it conducive to collusion, (2) the defendants' pricing behavior, and (3) the inconsistency of the defendants' pricing behavior with economic theory will assist the trier of fact in determining whether or not a price-fixing conspiracy existed among the defendants.[2]

The crux of Defendants' arguments is that Dr. French failed to rule out the possibility of non-collusive factors affecting Defendants' pricing decisions. Although Plaintiffs must present evidence that tends to exclude the possibility that Defendants acted independently in order to survive a motion for summary judgment, *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986), there is no such requirement that an expert affirmatively rule out the possibility of pricing decisions being made on the basis of non-collusive factors before any of his testimony is admissible. Dr. French's structural analysis of the real estate market and behavioral analysis of Defendants' pricing will assist the trier of fact in making its ultimate determination of whether a price-fixing conspiracy existed.

With respect to Dr. French's structural analysis of the Kentucky real estate market, it is immaterial that Dr. French did not define the relevant geographic market. Plaintiffs have alleged

---

[2] To succeed on their claim of a price-fixing conspiracy without direct evidence, Plaintiffs must show (1) that the defendants acted in a consciously parallel fashion, and (2) "plus factors" which tend to exclude the possibility of non-collusive action.

a horizontal price-fixing conspiracy, which is a *per se* violation of § 1 of the Sherman Act. "In such circumstances a restraint is presumed unreasonable without inquiry into the particular market context in which it is found." *National Collegiate Athletic Ass'n v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 100 (1984). In addition, Dr. French's failure to define the rules of the conspiracy or consider how certain characteristics of the real estate market may be pro-competitive is immaterial to whether his testimony is admissible. As explained above, Dr. French is not require to prove a successful conspiracy on his own before his testimony is admissible.

With respect to Dr. French's behavioral analysis, the Court finds that Dr. French's testimony regarding Defendants' pricing is sufficiently reliable under *Daubert* to be admissible. Dr. French examined the raw data on Defendants' real estate transactions for the years 2001 to 2005, finding the mean, median, and mode of the two-sided and one-sided commissions charged by each Defendant. Dr. French also examined the average commission rates by county in order to determine whether any local markets were "free of conspiratorial effects." DN 639-10, Dr. French Supp. Report at ¶ 32. Dr. French then performed a regression analysis to determine whether commission rates varied with the selling price of a home. Thus, Dr. French's opinion that Defendants' commission rates hovered around 6% for two-sided transactions and 3% for one-sided transactions rests upon a reliable foundation. *See Harcros Chemical*, 158 F.3d at 566 (finding that expert testimony based upon simple arithmetic, algebra, and multiple regression analysis utilized a methodology that was well-established as reliable).

Defendants have not alleged that the data upon which Dr. French relies is inaccurate or flawed, or that Dr. French incorrectly calculated the average commission rates of Defendants. Instead, Defendants' arguments go to the accuracy of the conclusions Dr. French drew from the

10

data. "[T]he judge should not exclude evidence simply because he or she thinks there is a flaw in the expert's investigative process which renders the expert's conclusions incorrect. The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 746 (3d Cir.1994). "The grounds for the expert's opinion merely have to be good, they do not have to be perfect." *Id.* at 744. With respect to any perceived weaknesses in Dr. French's testimony, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Thus, the Court will allow Dr. French to testify about these matters.

However, the Court will not allow Dr. French to testify as to his ultimate opinion that a conspiracy likely existed among the defendants during the class period. Such a conclusion embraces a legal conclusion which depends on anti-trust doctrine in which Dr. French is not qualified to offer an opinion. *See State of Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc.*, 925 F.Supp. 1247, 1254 (S.D. Ohio Mar. 11, 1996). Further, Dr. French fails to differentiate between conscious parallelism and illegal, collusive price-fixing. *See Williams Oil Co., Inc. v. Phillip Morris USA*, 346 F.3d 1287, 1323 (11th Cir. 2003). Thus, Dr. French's ultimate opinion cannot assist the trier of fact in determining whether the defendants' behavior was legal or illegal. Accordingly, Dr. French will not be allowed to testify as to the ultimate opinion that a conspiracy among Defendants existed during the class period.

### b. Dr. French's Testimony on Damages

#### i. *Dr. French's Report*

Dr. French opines that, assuming Defendants are found liable, a reasonable estimate of aggregate class-wide damages is $58.2 million dollars. Dr. French bases this opinion upon his

application of the "yardstick" method, which involves identifying either another geographic

market where there are competitive sales of the product or service. To compute the amount of

aggregate class-wide damages, Dr. French multiplied the total commissions paid by class

members by his calculated commission overcharge percentage, which is the difference between

the Defendants' average commission rate[3] and the average commission rate in an appropriate

competitive benchmark.

As a competitive benchmark, Dr. French employed the average commission rates in the

United States as provided by Real Trends, a real estate consulting firm ("Real Trends" data).

Real Trends estimates average commission rates throughout the United States by dividing the

total gross commission revenue by the total sales volume for the top 500 brokerages in the

country, as well as for additional brokerages characterized as "up and coming." DN 639-1 at ¶

113. Thus, Real Trends data consists of weighted averages, where the weights are the price of

the home sold. *Id.* Dr. French acknowledges the short-comings of the Real Trends data in that it

includes Kentucky and other markets that may be similarly impacted by anti-competitive

activity. However, Dr. French opines that the impact of Kentucky on the nationwide results is

small and that the inclusion of Kentucky would result in a more conservative damages estimate.

DN 639-1 at ¶ 115. Dr. French explained that the Real Trends data is the only publically

---

[3] The Defendants' transactional data is comprised of data from Semonin, Rector-Hayden (after it was acquired HomeServices), the Realogy Defendants, and McMahan Company. The key fields included in the data are the date of closing, the address of the property, the selling price, the total commission, the split with another broker (if any), and whether the commission was for half of or for the full transaction. For purposes of calculating damages, Dr. French removed transactions where a defendant did not participate in the listing side. Dr. French also combined transactions listed twice, one for the listing half and one for the selling half, into one full transaction. Additionally, Dr. French eliminated as outliers full commissions that are 3% or lower or 10% or higher and half commissions that were 1.5% or lower and 5 % or higher.

available data on average real estate brokerage commission rates during the class period. DN 639-1 at ¶ 111.

Dr. French performed a two-sample t-test for the Real Trends' weighted average commission rates and Defendants' weighted average commission rates for the years of 2004 and 2005, resulting in a statistically significant difference between the Real Trends averages and Defendants' averages except for Realogy in the Lexington market in 2005.[4,5] DN 639-10 at ¶ 68-70. Dr. French ran the test in the Statistical Analysis System ("SAS") program, specifying that Defendants' average are weighted by selling price and that Real Trends data are weighted by total volume. Dr. French further explained that the results of the test are based on the Satterthwaite Test which does not assume equal variances. *Id.* at ¶ 69. Based upon the results of this test, Dr. French rejected that the difference was due to chance.

     ii.   *Admissibility*

Defendants contend that Dr. French's testimony regarding damages is inadmissible pursuant to Rule 702 and *Daubert* because his methodology is not reliable.[6] According to

---

[4] Dr. French performed this t-test in response to Mr. Kleinrichert's expert report which criticized Dr. French's failure to determine whether the differences between the Real Trends data and Defendants' data was statistically significant. Dr. French previously did not have significant data to perform such a test. However, Mr. Kleinrichert supplied Dr. French with spreadsheets purporting to be the underlying data for the Real Trends data. Dr. French noted that "[he is] not yet convinced [he has] the fill dataset because of the discrepancies between the underlying data and the national averages reported by Real Trends." DN 639-10 at ¶ 70 n. 66. Dr. French then stated that he had not had the opportunity to learn the source of the spreadsheets relied upon by Mr. Kleinrichert. *Id.*

[5] Dr, French opines, however, that a statistically significant result likely would have been obtained had a lower and superior benchmark been available to him.

[6] Defendants also argue that Dr. French's damages testimony is inadmissible because he did not calculate individual class members' damages. However, this argument is not related to whether or not Dr. French's testimony regarding his calculation of aggregate class-wide damages is admissible pursuant to Rule 702 and *Daubert*.

Defendants' expert, Mr. Kleinrichert, to perform an appropriate damages calculation using the benchmark method, an expert must address and incorporate the following: (1) the expert must identify an appropriate benchmark market; (2) the expert must use relevant and reliable data; (3) the expert must account for non-price-fixing explanations for any observed price difference between the chosen benchmark and the market at issue; (4) the expert must make reasonable and supportable assumptions; and (5) the expert must perform his calculation in a way that can be replicated and tested.  DN 693-13, Kleinrichert Report, at p. 2-3.

With respect to the appropriateness of Dr. French's chosen benchmark, Defendants criticize Dr. French's failure to equalize the Real Trends data to Kentucky in order to make the Real Trends data a relevant and reliable benchmark.  In comparing the Real Trends data with the Defendants' transaction data, Dr. French took into account the influence of housing prices and the sales of newly constructed homes.  DN 639-1 at ¶ 117.  However, Defendants criticize Dr. French's failure to control for other potential explanatory variables including the following: (1) the sales price of homes; (2) changes in the sale prices of homes; (3) competition among brokers for agents; (4) transactional costs associated with varying regulatory requirements; (5) growth rates in the real estate market; (6) changes in the real estate markets; (7) the rate of new construction in localized markets; (8) rates of employment, including employment compensation rates; (9) localized economic factors; (10) localized lending factors; (11) consumers' taste; (12) consumers' sophistication; (13) consumers' cultural backgrounds; (14) local customs regarding real estate commissions; (15) census and population trends; (16) or any other factors that may influence commission rates in national markets differently than in Kentucky. [7] DN 638 at p. 37.

─────────────────────────────

[7] However, Defendants have not put forth any evidence or analysis that these factors actually explain differences in commission rates.

14

Defendants further contend that Dr. French *could not* have performed such an analysis because he did not possess the actual underlying Real Trends data, but only the published national averages. Because these are a few of the variables or factors which may influence commission rates in national markets differently than in the Kentucky real estate market, Defendant contend that the Real Trends data is an erroneous yardstick. Thus, Defendant argues that "Dr. French's opinion, based upon his blindly chose and largely unadjusted benchmark is inherently unreliable and inadmissible." DN 638 at p. 38.

Defendants further contend that Dr. French's adjustments to Defendants' transaction data – accounting for the price of a home and the sales of new construction – are unreliable because they are based upon unreliable assumptions. Dr. French stated in his supplemental report that he adjusted the Defendants' transaction data for the average selling price of a home, "which is likely higher in the Real Trends data than in Defendants' data" and "accounted for new construction transactions which tend to have lower commission rates." DN 639-10 at ¶ 59.

To account for the selling price of the home, Dr. French first performed a multiple regression analysis to determine whether the selling price of a home was a significant factor in explaining the commission rates on homes sold in Kentucky, finding it to be a "quite small," but statistically significant factor. Dr. French then accounted for this factor by calculating the weighted average commission rate in Kentucky for homes sold at a price of more than $200,000 and using "[t]he difference between commissions for all homes and [commissions for] homes greater than $200,000 . . . to conservatively adjust the defendants' commissions to control for any difference in the price of homes in the Real Trends benchmark and in Kentucky." DN 639-1 at ¶ 126. Defendant attacks the reliability of this adjustment by criticizing Dr. French's failure to provide any analysis, explanation, or empirical data to support the cut-off of $200,000.

15

To account for the sales of new construction, Dr. French computed the weighted average commission for the Home Services Defendants, the only defendants that provided data on the sale of new homes, with and without including the new construction transactions. DN 639-1 at ¶ 127. Dr. French noted that the inclusion of new construction sales resulted in a very slight decline in the Home Services Defendants' weighted average commission rates. Dr. French then used the difference between the averages to adjust Defendants' transaction data. Defendant attacks the reliability of this adjustment by criticizing Dr. French's assumption that the rate of new construction for Home Services clients in Kentucky is the same as the rate of new construction for the Real Trends data. Defendants contend that this assumption is baseless, as Dr. French did not have the Real Trends underlying data. However, in Dr. French's supplemental report, he stated that he compared data on new building permits from the Census Bureau with the number of residential property re-sales from the National Association of Realtors. DN 639-10 at ¶ 73. Dr. French found that the rates of new construction relative to re-sales are substantially the same in Kentucky as in the rest of the country and so "any attempt to account for the difference between the nationwide and Kentucky rates of new construction would have a *de minimis* impact on the overcharge percentages." *Id.*

Although the yardstick method is a generally accepted method of proving damages in anti-trust cases, s*ee Conwood Co., L.P. v. United States Tobacco Co.*, 290 F.3d 768, 793 (6th Cir. 2002), that itself is insufficient to be admissible pursuant to Rule 702 and *Daubert.* To be admissible, Dr. French's testimony must also be based upon sufficient facts or data and apply the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. "Central to this so-called 'yardstick' approach to proving antitrust damages is the requirement the plaintiff identify

a sufficiently comparable [market] against which it can measure its quantum of damages." *Home Placement Service, Inc. v. Providence Journal Co.*, 819 F.2d 1199, 1206 (1st Cir. 1987).

However, courts have recognized the difficulties Plaintiffs face in proving damages in antitrust cases. The Supreme Court has explained that "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981). "One of the limitations involved in proving antitrust damages is establishing what the market price of the commodity or service would have been in an unmanipulated market. Where, however, there is a dearth of market information unaffected by the collusive action of the defendants, the plaintiff's burden of proving damages, is, to an extent, lightened. *New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 88-89 (2d Cir. 2000) (internal quotation omitted). Thus, "while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931).

Although the Real Trends data is not a perfect benchmark, due to its inclusion of the real estate markets of Kentucky and other states which may be affected by anti-competitive activity and due to the impossibility of controlling for all possible variables, it provides a sufficiently reliable benchmark to support a just and reasonable inference of damages. *See Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-265 (1946). Because the sharing of average commissions among brokerages may facilitate anti-competitive conduct, the Real Trends data likely provides the most comprehensive data set available to Plaintiffs. Indeed, a report by the Department of Justice ("DOJ") and the Federal Trade Commission on competition in the real

17

estate brokerage industry noted that, "[t]here is not much empirical evidence on commission rates" because "[t]he data are usually proprietary and not readily available to the public or to academic analysts." Federal Trade Commission and the U.S. Department of Justice, *Competition in the Real Estate Brokerage Industry* (April 2007), available at http://www.justice.gov/atr/public/reports/223094.pdf. The DOJ then stated that, to their knowledge, "REAL Trends is the only source that publishes commission rate data." *Id.* at p. 38.

Dr. French stated in his Expert Report Regarding Class Certification that, "[t]o construct an acceptable econometric model of the real estate brokerage market, the variables that likely influence commission rates must be identified and then tested for statistical significant using regression analysis." DN 242-2 at ¶ 28.   Ultimately, Dr. French identified two explanatory variables on average commission rates - the selling price of a home and the sale of new construction homes.  He then accounted for these explanatory variables in order to make the Real Trends data a more reliable benchmark.  Dr. French's failure to control for every conceivable variable, including such non-quantifiable factors such as consumers' tastes, cultural backgrounds, and sophistication, does not make his testimony inadmissible. *See Bazemore v. Friday*, 478 U.S. 385, 400 (1986) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility."); *Jahn v. Equine Services, PSC*, 233 F.3d 382, 390 (6th Cir. 2000) ("In order to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury.  The fact that several possible causes might remain 'uneliminated' only goes to the accuracy of the conclusion, not to the soundness of the methodology.").

In sum, Defendants' challenges to Dr. French's testimony go to the weight of his conclusions and not to its admissibility.  Dr. French's utilization of the Real Trends data as a

benchmark is admittedly not a perfect benchmark. Given the dearth of market information available, Dr. French's application of the yardstick method to the available data is sufficiently reliable to be admissible under *Daubert*. Although Dr. French's testimony may be shaky, his opinions were based upon facts in the record and his analysis controlled for variables for which he had data. Thus, challenges to his testimony go to the accuracy of his conclusions and not to the reliability of his testimony. *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530. Accordingly, the Court will allow Dr. French's testimony as to the issue of damages.

## 2. Defendants' Motion to Exclude the Expert Testimony of Dr. Abdullah Yavas

Dr. Yavas, who holds a Ph.D. in economics and is the Real Estate Program Distinguished Professor at the University of Wisconsin-Madison, offers opinions relating to the liability of the defendants, damages, and HomeServices of America's control over Rector-Hayden and Semonin. The Court will separately examine the substance and admissibility of each of these opinions.

### a. Dr. Yavas's Testimony on Liability

#### i. *Dr. Yavas's Report*

Dr. Yavas opines that, based on his statistical analysis of the data and the correspondence among agents, "Defendants colluded to fix and maintain supra-competitive real estate broker commissions, and refused to compete on the basis of price, during the Class Period." DN 639-8 at ¶ 62. In his January 5, 2012 expert report, Dr. Yavas sets forth the basis for this opinion. First, Dr. Yavas explains how economic principles, together with the homogenous nature of real estate brokerage services, dictates that commission *amounts* charged for each transaction should be similar and not increase proportionally with the selling price of the home. From Defendants'

19

data,[8] Dr. Yavas calculated that the mode and median full commission rate were 6% and the median and mode buyer's broker commission rate were 3%. Dr. Yavas then compared Defendants' data to data for other cities across the United States to illustrate how, in contrast to Kentucky, other cities saw significant decreases in the proportion of buyer's broker commission rates that were exactly 3% from 2001 to 2005. DN 639-8 at ¶ 32-33. Next, Dr. Yavas analyzed Defendants' transaction data by performing regression analyses to determine the effect of location, year, and transaction price on the full commission rate, the listing commission rate, and the buyer's broker commission rate. DN 639-8 at ¶ 36-37. After finding that these independent variables had small or no effect on Defendants' commission rates, Dr. Yavas explained that this is the opposite of what one would expect in a competitive market. *Id.* at ¶ 41.

Dr. Yavas further remarks on characteristics of the real estate market and facts in the record which, in his view support a conclusion that a conspiracy among Defendants existed. Dr. Yavas offers his opinion on how Defendants' conduct which facilitates and enforces a conspiracy, such as cooperation between brokers and "steering" potential buyers away from homes with a listed buyer's broker rate of less than 3%. Dr. Yavas also highlights Defendants' conduct which, in his opinion, is against their economic interest but for the existence of a conspiracy to fix prices.

        ii.   *Admissibility*

Defendants contend that Dr. Yavas's testimony regarding liability is inadmissible because he did not follow the generally accepted or reliable methodology for determining whether a price-fixing conspiracy existed. In their motions to exclude Dr. Yavas' testimony,

---

[8] In his January 5, 2012 report, Dr. Yavas utilized the transaction data of Rector-Hayden, Semonin Realtors, Century 21, and Coldwell Banker Real Estate Corporation. DN 639-8 at ¶ 17. In his supplemental report, dated February 23, 2012, Dr. Yavas also utilized the transaction data for Coldwell Banker McMahan Company.

Defendants criticize the following aspects of Dr. Yavas's report: (1) He assumed real estate listing services are homogenous and that, because of this fact, competition should force listing commission rates to decrease as home prices increase; (2) He did not conduct a proper structural analysis because he did not determine the relevant market or conduct an analysis of market power and did not determine whether any of the structural factors may in pro-competitive; (3) He did not perform sufficient empirical analysis of Defendants' pricing; and (4) He opined that price fixing existed with excluding any other possible causes for collusive effects in the market. Defendants also contends that Dr. Yavas's regression analysis, in which he determines the impact of price, year, and location on commission rates, is inadmissible because it fails to capture over 96% of the factors that may impact commission rates.[9]

As the Court explained above, Defendants conflate the issue of admissibility with the issue of the sufficiency of Plaintiffs' evidence to survive summary judgment. Dr. Yavas's testimony need not prove a successful conspiracy by itself in order to be admissible under *Daubert* and Rule 702 as circumstantial evidence of a conspiracy. *Harcros Chemicals, Inc.*, 158 F.3d 548 at 564-65. The Court finds that Dr. Yavas's testimony will assist the trier of fact to determine whether or not a conspiracy existed among Defendants.

Dr. Yavas's opinion that real estate brokerage services is a homogenous product is supported by some evidence. Dr. Yavas cites to his forthcoming study in a real estate journal which examined 318,221 listings and 243,625 sales and determining the houses listed by discount brokers sell at prices similar to non-discount brokerage listings and only take

---

[9] Defendants argue that Dr. Yavas failed to calculate the R-square, which is "[a] statistic that measures the percentage of the variation in the dependent variable that is accounted for by all of the explanatory variables in a regression model." REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 355 (3d ed. 2011). Defendants' expert, Mr. Kleinrichert, calculated the R-square to be less than 4%.

approximately 3 more days to sell.  DN 639-8 at ¶ 61.  Dr. Yavas also relies on his vast research

on real estate brokerages in order to make such an opinion.  *Id.* at ¶ 2.

        With respect to Dr. Yavas's structural analysis, it is irrelevant that Dr. Yavas did not

define the relevant market as Plaintiffs have alleged a *per se* violation of the Sherman Act.  *See*

*National Collegiate Athletic Ass'n,* 468 U.S. at 100.  However, Dr. Yavas did in fact look at the

market power of Defendants .  Specifically, Dr. Yavas explained that collusion is easier to

enforce and maintain if a small number of firms have a significant market share.  He then noted

the market shares of Defendants: Semonin had between 18.5% and 21.1% of the market in

Louisville and had more transactions than any other firm each year of the class period; Coldwell

Banker McMahan was ranked second in Louisville in 2005 and was in the top four in each year

of the class period; Re/Max Properties East was in the top three firms in Louisville during the

class period; HomeServices announced that it operates the two most dominant real estate brands

in Kentucky and Southern Indiana.  DN 639-8 at ¶ 48.  Further, Dr. Yavas was not required to

determine whether any of the factors  may have pro-competitive effects before such testimony is

admissible.

        Although Defendants criticize Dr. Yavas's failure to conduct more empirical analysis of

Defendants' pricing, his failure to do so is immaterial to whether the analysis actually performed

by Dr. Yavas is admissible as he is not required to successfully prove a conspiracy on his own.

Dr. Yavas analyzed Defendants' data by calculating the average commission rates (and the

prevalence of an exact 6% and 3% rate) and performing regression analyses to determine the

effect of location, home prices, and year on the commission rates.  Regression analysis is a

generally accepted methodology well-established as reliable.  *See, e.g., Askew v. City of Rome*,

127 F.3d 1355, 1365 n.2 (11th Cir. 1997).  Indeed, Defendants do not argue that Dr. Yavas relied

upon incorrect or incomplete data or improperly performed his regression analyses. Mr. Kleinrichert agreed that Dr. Yavas performed proper and reliable regression analyses but criticized the tests for having a low R-square value and therefore not explaining the variance in Defendants' commission rates.[10]  Kleinrichert Deposition, DN 641-6 at p. 148-49. Such a criticism does not render Dr. Yavas's testimony inadmissible, as Dr. Yavas did not perform these analyses to explain the variance in commission rates but instead to determine whether three specific variables had any effect on commission rates. Because Dr. Yavas found that these three variables had little or no effect on commission rates, it is not surprising that the three variables fail to explain the variance in Defendants' rates. Dr. Yavas explained that the variables' lack of explanatory power is opposite of what one would expect in a competitive market. Thus, the low R-square value of the regression analyses does not make it unreliable. Thus, the Court finds the analysis of Defendants' pricing performed by Dr. Yavas will assist the trier of fact in determining whether Defendants engaged in parallel pricing.

However, the Court will not allow Dr. Yavas to testify as to his ultimate opinion that the defendants colluded to fix and maintain supra-competitive real estate broker commissions and refused to compete on the basis of price during the class period. Such a conclusion embraces a legal conclusion which depends on anti-trust doctrine in which Dr. Yavas is not qualified to offer an opinion. *See State of Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc.*, 925 F.Supp. 1247, 1254 (S.D. Ohio Mar. 11, 1996). Dr. Yavas may, however, testify as to Defendants' conduct which is consistent with the existence of a conspiracy among the defendants to fix real estate broker commissions.

---

[10] R-square is "[a] statistic that measures the percentage of the variation in the dependent variable that is accounted for by all of the explanatory variables in a regression model." REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 355 (3d ed. 2011). Defendants' expert, Mr. Kleinrichert, calculated the R-square to be less than 4%.

23

### b. Dr. Yavas's Testimony on Damages

#### i. *Dr. Yavas's Report*

Dr. Yavas utilizes the yardstick method, comparing Defendants' data to chosen benchmarks, to calculate class-wide damages. Instead of a benchmark commission *rate*, Dr. Yavas utilizes a benchmark commission *amount* – the amount that, in Dr. Yavas's opinion, would prevail in a market with price competition. Dr. Yavas opines that competitive commission fees are reflected in fees earned from lower priced properties, as "[t]he fact that agents are willing to provide brokerage services at the same commission rate for lower priced properties means that their fees from those properties are sufficient to cover their marginal costs, as agents would rather opt out of a submarket if expected commission revenue in that submarket is not sufficient to cover the cost of their services." DN 639-8 at ¶ 64.

To determine the benchmark commission amount, Dr. Yavas calculated the average listing commission fee and the average buyer's broker commission fee for properties ranging from $20,000 to $100,000 and for properties ranging from $20,000 to $120,000. *Id.* at ¶ 65. Dr. Yavas then calculated the average listing commission fee and the average buyer's broker commission fee for properties ranging from $100,000 to $1,000,000 and for properties ranging from $120,000 to $1,000,000. *Id.* at ¶ 66. To compute the excess fees charged for the higher-priced properties, Dr. Yavas calculated the difference in the listing and buyer's broker's fees of the two price groups - $20,000 to $100,000 versus $100,000 to $1,000,000 and $20,000 to $120,000 versus $120,000 to $1,000,000. *Id.* at ¶ 67. The resulting damages estimate is $154,289,430 using the $100,000 cutoff and $126,600,361 if the cutoff price is $120,000. *Id.* at ¶ 68.

As an alternative damage estimate, Dr. Yavas employs a benchmark of $4800, which he opines is a competitive commission fee per transaction. Dr. Yavas estimated the competitive commission fee by multiplying the Defendants' average selling price by the Defendants' average buyer's broker commission rate of 2.96% and then adding $500, which is typically the price charged by a discount flat fee broker to list the seller's property on the Multiple Listing Service site. DN 639-8 at ¶¶ 78-79. This amount, $4,480.67 per sale, was then rounded up to $4800 per house sold or $2400 for each side "to leave some room for error." *Id.* at ¶ 84. To support this estimation, Dr. Yavas notes his recent studies which showed that houses listed by discount brokers sold at prices similar to non-discount brokerage listings and  that there is no statistically significant relationship between the buyer's broker commission rate and the marketing time for a listing. *Id.* at ¶¶ 80-81. Dr. Yavas calculated the weighted average listing commission fee and the weighted average buyer's broker commission fee for the Defendants' data. DN 639-8 at ¶ 74. To determine the amount of class-wide damages, Dr. Yavas multiplied the number of a defendant's listing transactions by the difference between the defendant's  weighted average listing commission fee and the estimated competitive fee of $2400. Dr. Yavas repeated this calculation using the defendant's selling transactions and weighted average selling commission fee. *Id.* at ¶ 89. This resulted in a total damages estimate of $163,415,007.

    ii.   *Admissibility*

Defendants contend that Dr. Yavas did not follow any scientific, reliable methodology in developing his benchmarks.[11] Defendants argue that Dr. Yavas cannot identify a single real estate market in the country where full-service brokers apply fee structures similar to his created

---

[11] Defendants also argue that Dr. Yavas's damages testimony is inadmissible because he did not calculate individual class members' damages. However, this argument is not related to whether or not Dr. Yavas's testimony regarding his calculation of aggregate class-wide damages is admissible pursuant to Rule 702 and *Daubert*.

benchmark. Instead, Dr. Yavas has merely created a fictional, hypothetical benchmark that reflects his thoughts on how a real estate market should be structured. As a result, Defendants contend that Dr. Yavas's benchmarks are irrelevant and his opinions based on them are irrelevant and inadmissible. The Court will separately examine each chosen benchmark to determine its admissibility pursuant to Rule 702 and *Daubert*.

With respect to Dr. Yavas's first and second chosen benchmarks, which are the average commission *amounts* for homes priced lower than $100,000 and $120,000 respectively, Defendants contend that Dr. Yavas's chosen thresholds of $100,000 and $120,000 for "lower priced homes" are without justification and are based on an unfounded assumption of what marginal costs exist in the real estate industry. Dr. Yavas, in his supplemental report, provided the following reasons for his choice of $100,000 and $120,000 thresholds for lower-priced homes: (1) the estimate threshold price covers a significant proportion of the defendants' transactions which ensures that the threshold commission amount is an amount at which the defendants already provide brokerage services; (2) Dr. Yavas's research and conversations with brokers in the industry over the years; (3) a list of the number of towns in which the average commission fee for the entire set of transactions in each town were below his competitive benchmark, which shows that the benchmark competitive fee was generating sufficient commission income for agents in the listed cities; (4) the ability of discount brokers to provide brokerage services at an amount less than the benchmark amount. DN 651-13 at ¶ 49.

The Court finds that Dr. Yavas's testimony regarding this chosen benchmark method – the commission amount for lower priced homes – is irrelevant and thus inadmissible. Although the yardstick method is widely accepted by courts to measure damages, *see Conwood Co.*, 290 F.3d at 793, Dr. Yavas does not employ a relevant benchmark. Dr. Yavas has not shown that,

26

but for the conspiracy among Defendants, Defendants would charge a commission for all homes equal to the commission *amount* charged for lower-priced homes. Although Dr. Yavas opines that this is what *should* happen in a competitive market, he has not identified any market which actually employs such a commission structure. This suggests to the Court that, either all real estate markets are anti-competitive or that the commission amounts received for lower-priced homes is not what real estate brokers would charge in the absence of a conspiracy to fix prices. Simply put, what real estate brokers would ideally charge in a fictional, perfectly competitive market is irrelevant to a determination of what Defendants would charge in the absence of a price-fixing conspiracy. Dr. Yavas has failed to identify a sufficiently comparable market against which he can measure Plaintiffs' damages. *See Home Placement Service, Inc. v. Providence Journal Co.*, 819 F.2d 1199, 1206 (1st Cir. 1987). Thus, any estimate of Plaintiffs' damages would be based only on speculation or guesswork. Accordingly, the Court will not allow Dr. Yavas's testimony regarding damages utilizing these benchmarks.

With respect to Dr. Yavas's alternative damage calculation, Defendants contend that the benchmark of $4800 is not the product of any scientific or reliable methodology and is likewise irrelevant and inadmissible. The Court agrees. Dr. Yavas does not employ a relevant benchmark. Dr. Yavas has not identified any other real estate market which actually employs such a commission structure. Like with the other benchmarks, this suggests to the Court either that all real estate markets are anti-competitive or that Defendants would not charge a flat fee of $4800 but for the existence of a conspiracy to fix prices. Further, although Dr. Yavas points to evidence which shows that homes sold with a discount broker sell at similar prices and after a similar length of time as homes sold with a full-service broker, there is no such evidence that the *services* provided by discount brokers are comparable to the services provided by full-service

brokers. Providing similar results is not the same as providing similar services. There is no evidence that Defendants would, or could, provide their services for $500 and still cover their expenses. Thus, Dr. Yavas's assumption that a full-service brokerage would offer its services for the same price as a discount brokerage but for a conspiracy is unfounded. "An expert's opinions must be based on the evidence in the case, and, if he bases his opinions on empirical assumptions, those assumptions must be supported by evidence." *In re Ready-Mixed Concrete Antitrust Litig.,* 261 F.R.D. 154, 165 (S.D. Ind. 2009) (citing *Elcock v. Kmart Corp.,* 233 F.3d 734, 756 (3d Cir.2000) (reversing district court's admission of expert economic damages testimony relying on empirical assumptions unsupported by the record)). Accordingly, the Court will not allow Dr. Yavas's testimony regarding damages utilizing the $4800 benchmark.

### c. Admissibility of Dr. Yavas's Testimony on Control

In addition to Dr. Yavas's opinions pertaining to liability and damages, Dr. Yavas examines the structure and operations of the HomeServices Defendants and opines that "[t]he presence of . . . interlocking officers and directors overwhelmingly indicates that HomeServices of America, Inc. managed and directly participated in the business of HomeServices of Kentucky . . ." and that HSA therefore "directly participated in the management and operation of Rector-Hayden and Semonin" or at least "approved" their operations. Yavas Report, DN 639-8 at ¶¶ 18-20.   Dr. Yavas goes on to opine that "it is highly plausible that HomeServices of America knew, prior to and after its acquisition of Rector-Hayden, the facts indicating that Rector-Hayden had entered into agreements with other real estate brokerages not to compete on the basis of price, to charge a 3% buyer's broker fee listing, and to charge a standard commission of 6%." *Id.*

28

The HomeServices Defendants contend that such opinions are inadmissible for the following reasons: (1) Dr. Yavas has not expertise in corporate governance; (2) it amounts to legal argument; (3) it constitutes impermissible legal conclusions on an ultimate issue of corporate control; (4) it misstates the law; and (5) it constitutes impermissible opinions as to HSA's subjective knowledge.

The Court agrees that such opinions are beyond the expertise of Dr. Yavas. Although Dr. Yavas has extensive experience in the real estate industry, such experience does not provide a foundation to opine as to corporate governance. Additionally, Rules 702 and 704 "prohibit experts from offering opinions about legal issues that will determine the outcome of a case." *See United States v. Sinclair*, 74 F.3d 753, 757 n. 1 (7th Cir. 1996). Finally, Dr. Yavas's opinion as to HSA's subjective knowledge does not assist a trier of fact, as the trier of fact is capable of drawing such an inference on its own. Accordingly, the Court will not allow Dr. Yavas to opine as to these matters.

### d. Dr. Yavas's Testimony as to McMahan Company

Defendant McMahan Company further contends that Dr. Yavas's testimony should be excluded for an additional reasons specific to it: Dr. Yavas based his opinions as to McMahan Company on an analysis of all Coldwell Banker franchisees in Kentucky and failed to analyze McMahan Company's data individually. After this was pointed out to Dr. Yavas during his first deposition, Dr. Yavas submitted a rebuttal report which purported to analyze McMahan Company's individual commission data. This report was served one day before Dr. Yavas's second deposition. First, McMahan Company argues that the report was an improper rebuttal report because it was not based on new data obtained since his initial report. Second, McMahan Company argues that the rebuttal report remained inadequate for the following reasons: (1) it

29

failed to explain how the data, which showed a weak, negative correlation between home prices and commissions, connected McMahan Company to the alleged conspiracy; (2) it failed to examine the McMahan Company data on an office by office basis to determine whether there are any local variations in the data; and (3) it failed to analyze the frequency of any particular commission rate for McMahan Company.[12]  Because the Court has already determined that Dr. Yavas's damages testimony and ultimate liability opinion are inadmissible, the Court will limit its analysis to whether the remainder of Dr. Yavas's liability testimony is admissible as to McMahan Company.

As an initial matter, although Dr. Yavas analysis of McMahan Company's individual data in his supplemental report was not in response to additional information obtained subsequent to his initial report, the Court will not exclude the report on this ground.  McMahan Company was able to depose Dr. Yavas as to his analysis of the individual data.  Accordingly, the Court finds that allowing the rebuttal report will not prejudice McMahan Company.

Dr. Yavas's failure to connect McMahan Company to the alleged conspiracy does not make his testimony inadmissible as to McMahan Company.  As explained above, Dr. Yavas is not required to successfully prove the existence of a conspiracy before his testimony is admissible.  To the extent that Dr. Yavas's testimony fails to adequately analyze McMahan Company's data or fails to adequately connect McMahan Company to the conspiracy, such inadequacies go towards the sufficiency of the evidence needed to overcome a motion for

---

[12] In response to McMahan Company's motion for summary judgment, Plaintiffs have submitted an additional declaration of Dr. Yavas.  In that report, Dr. Yavas listed the frequency of particular commission rates charged by McMahan Company and opines as to how McMahan Company's declining average commission rate throughout the class period corresponds to McMahan Company's increase in transactions where McMahan Company serves as the buyer-side broker and the seller-side broker.  McMahan Company has moved to strike or exclude this declaration.

summary judgment. McMahan Company has not faulted Dr. Yavas's qualifications or methodology. Accordingly, Dr. Yavas's liability testimony as it relates to McMahan Company will be allowed.

### 3.  Plaintiffs' Motion to Exclude Expert Testimony of Gary Kleinrichert

Mr. Kleinrichert does not opine as to Defendants' liability or provide a calculation of damages. Instead, Mr. Kleinrichert examines Dr. French's and Dr. Yavas's expert reports and opines as to the reliability of those reports.

#### a.  Mr. Kleinrichert's Report

In his expert reports, Mr. Kleinrichert opines as to generally-accepted methodologies for determining damages resulting from a price-fixing agreement and explains how Dr. French and Dr. Yavas did not follow such generally-accepted methodologies. Specifically with respect to Dr. French's damages calculations, Mr. Kleinrichert opines that the Real Trends yardstick is inappropriate and that Dr. French incorrectly adjusted Defendants' transaction data. Mr. Kleinrichert points out that, because Dr. French does not possess the transaction-level detail that generated the Real Trends averages, a "two sample means test" or a "t-test" cannot be performed to determine whether there is any statistically significant difference between the Real Trends data and the Defendants' transaction-level data.

Mr. Kleinrichert then conducted his own yardstick analysis, restricting the Real Trends data to states bordering Kentucky. DN 641-12 at p. 16. The results of this yardstick analysis show average commission rates for Defendants to be more comparable to the median commission rates in surrounding states. *Id.* at 39, Exhibit 3.   Kleinrichert also compiles several graphs, which purport to compare (1) Dr. French's benchmark average commission, (2) the median of the Real Trends Data, and (3)  Defendants' actual average commission rate when all

31

Real Trends data is included, when twelve high-priced real estate markets are excluded, and again when only states bordering Kentucky are included. DN 641-4 at p. 38, Exhibits 1-3.

With respect to Dr. Yavas's regression analyses showing the effect of location, year, and selling price on the commission rate, Mr. Kleinrichert opines that Dr. Yavas's analysis is flawed because he failed to calculate the R-square, which he explains as a measure of how well the variations in the exogenous variables explain the variation in the endogenous variable. Mr. Kleinrichert calculated the R-square value to be 4%, which he interprets as meaning that Dr. Yavas's model fails to capture over 96% of the factors that impact commission rates. DN 641-4 at 23. Mr. Kleinrichert also opines as to the reliability of Dr. Yavas's damages calculations; however, because the Court has already ruled Dr. Yavas's damages opinions inadmissible, these opinions are moot and will not be examined.

### b. Admissibility

Plaintiffs move to exclude Defendants' expert Mr. Kleinrichert's testimony pursuant to Rule 702 and *Daubert* because he is not qualified. As a result, Plaintiffs contend that Mr. Kleinrichert's methodologies are incorrect and unreliable. In the alternative, Plaintiffs move to exclude any of Mr. Kleinrichert's opinions formed after Plaintiffs took his deposition because he failed to provide many answers related to statistical principles during the deposition, effectively denying Plaintiffs a full opportunity to cross-examine him regarding the bases of his opinions.

Qualified experts are afforded the opportunity to offer opinion testimony as evidence where the court qualifies them as experts by "knowledge, skill, experience, training, or education." Fed.R.Evid. 702. The review of an expert witness' qualifications to testify is a preliminary factual determination for the district court. *Kingsley Associates, Inc. v.. Del-Met, Inc.,* 918 F.2d 1277, 1286 (6th Cir.1990). A trial court also "has broad discretion in the matter of

32

the admission or exclusion of expert evidence." *United States v. Kalymon,* 541 F .3d 624, 636 (6th Cir.2008) (quoting *United States v. Demjanjuk,* 367 F.3d 623, 633 (6th Cir.2004)). This circuit has held "[t]he issue with regard to expert testimony is not the qualification of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detriot,* 25 F.3d 1343, 1351 (6th Cir.1994).

Mr. Kleinrichert is a Certified Public Accountant (CPA) with a Bachelor of Science degree in Accounting and Computer Science. Mr. Kleinrichert completed one year of undergraduate courses in economics and one year of undergraduate courses in statistics. He has extensive litigation consulting experience providing valuation and damages assessments and performing forensic and accounting investigations. DN 641-1 at p. 28, Kleinrichert Report, Appendix I. During his deposition, Mr. Kleinrichert had difficulty explaining to the satisfaction of Plaintiffs' counsel several statistical principles such as the difference between a null hypothesis and an alternative hypothesis, the difference between a standard deviation and the standard error, and calculating and interpreting a R-square calculation. Plaintiffs argue that Mr. Kleinrichert's lack of a higher degree in statistics or economics and his difficulties explaining basic statistical principles in his deposition illustrates that he is unqualified to assist the fact finder in understanding the issues about which he opines.

Although Mr. Kleinrichert does not have a degree in statistics and has not taken more than basic statistics coursework, he has extensive experience performing damage assessments in complex litigation matters and testified that he has conducted statistical tests during his employment. DN 641-6 at p. 77. Mr. Kleinrichert's experience is sufficient to provide a foundation for his opinions regarding the proper method of calculating damages and the weaknesses in the damages calculations of Plaintiffs' experts. Mr. Kleinrichert's difficulty in

clearly explaining basic statistical principles to Plaintiffs' counsel during his deposition is insufficient to show that he is unqualified. Although Plaintiffs argue that Mr. Kleinrichert's interchanging use of the terms "standard error" and "standard deviation" illustrates a lack of qualification in statistical analysis, "[m]any authors use standard deviation to mean standard error." REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 298 (3d ed. 2011). More important to a determination of Mr. Kleinrichert's qualifications is his ability to properly apply the statistical principles in his analyses. Defendants have demonstrated that he possess sufficient "knowledge, skill, experience, training, or education" to provide testimony on statistical issues that will "assist the trier of fact." Fed. R. Evid. 702. Any weaknesses in Mr. Kleinrichert's qualifications or experience in statistics are issues for the trier of fact to weigh in its assessment of the evidence, rather than for the Court to assess in its gatekeeping function. *See Daubert*, 509 U.S. at 596.

Plaintiffs also generally object to Mr. Kleinrichert's methodology as unreliable. Plaintiffs do not challenge a specific methodology or analysis actually applied by Mr. Kleinrichert, but instead challenge Mr. Kleinrichert's advancement of an incorrect and unreliable methodology for measuring variability in this case. According to Plaintiffs, the appropriate test for measuring variability between the Real Trends data and the Defendants' data would utilize the standard error, while Mr. Kleinrichert proposes that the appropriate test would utilize the standard deviation of the underlying transactions – which are not available for the Real Trends data. Thus, Mr. Kleinrichert does not apply his own methodology but merely challenges the appropriateness of Dr. French's methodology. The trier of fact can determine which expert's opinion is correct. The Court will allow Mr. Kleinrichert's testimony.

## CONCLUSION

34

For the foregoing reasons, IT IS HEREBY ORDERED as follows:

(1) The Defendants' motion to exclude the expert testimony of Dr. French and Dr. Yavas (DN 637) is GRANTED IN PART. Dr. French and Dr. Yavas may not testify as to their ultimate opinions that a price-fixing conspiracy existed. Dr. Yavas may not testify as to (1) the calculation of damages or (2) Home Services of America's control of Rector-Hayden and Semonin.

(2) McMahan Company's separate motion to exclude the expert testimony of Dr. Yavas (DN 634) is DENIED. To the extent not excluded by this Opinion, Dr. Yavas may testify as to McMahan Company.

(3) Plaintiffs' motion to exclude the expert testimony of Mr. Kleinrichert (DN 641) is DENIED.


July 3, 2012
Date

Thomas B. Russell
United States District Judge


35